```
               IN THE UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
                         DALLAS DIVISION

UNITED STATES OF AMERICA,      §
                               §
               Plaintiff,      §
                               § Criminal No. 3:10-CR-123-D(01)
VS.                            §
                               §
MONDELL PETERSON,              §
                               §
               Defendant.      §
```

                         MEMORANDUM OPINION
                         <u>    AND ORDER    </u>

   Defendant Mondell Peterson ("Peterson")—charged with the offense of unlawfully possessing a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2)—moves to suppress a firearm seized from his vehicle on October 31, 2009 and any statements he made to a police officer on that date.[1]  Following an April 15, 2011 hearing, and for the reasons that follow,[2] the court grants the motion to the extent of suppressing Peterson's statements and denies the motion to the extent he seeks to suppress the seizure of

---

   [1]Peterson filed his motion to suppress on September 8, 2010, and filed a supplemental motion to suppress on October 6, 2010.  In his motion, he moves to suppress any statement made to Detective James Groom ("Detective Groom") of the Lancaster Police Department on November 9, 2009.  Peterson withdrew this request in his supplemental motion, contending that he did not make any statements to Detective Groom.  At the hearing, the government called Detective Groom to testify that he gave Peterson *Miranda* warnings before Peterson admitted that he had possessed the firearm seized on October 31, 2009.  But because Peterson has withdrawn his challenge in this respect, the court is not deciding whether incriminating statements that Peterson allegedly made to Detective Groom should be suppressed.

   [2]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

the firearm.

I

On Halloween night 2009, Peterson's Mercury Grand Marquis broke down in the left lane of the 3300 block of North Houston School Road, a well-traveled, four-lane road divided by a grassy median. The vehicle had lost its right front wheel, and it appeared that the bolts that secured the wheel to the vehicle had broken off. As a result, Peterson's car was inoperable.

Lieutenant Bryan Dorsey ("Lt. Dorsey") of the Lancaster Police Department ("LPD") was on patrol by himself that evening[3] and observed Peterson's vehicle. After making contact with Peterson a few minutes prior to 10:00 p.m., Lt. Dorsey asked him if he needed a wrecker, and he also used his flashlight to help Peterson locate the missing wheel. Lt. Dorsey also informed Peterson that his car had to be towed because it was blocking traffic, and he called 24-Hour Wrecker Service to send a tow truck. Another LPD officer, Ricardio Sparks ("Officer Sparks"), arrived on the scene and parked behind Lt. Dorsey's police unit.

While Officer Sparks remained with Peterson, Lt. Dorsey conducted an inventory search of Peterson's car in accordance with his understanding of the LPD vehicle inventory search policy that

---

[3]Lt. Dorsey's duties did not typically involve patrol, but he was probably out that night because it was Halloween.

he had received in September 2007.[4]  The purpose of conducting such searches is to protect individuals from losing personal property when a vehicle is taken into custody and to protect the LPD from claims made for lost property.  Depending on the circumstances, it may involve investigative purposes, but it is primarily for safekeeping.  Peterson was not in handcuffs while the inventory search was being conducted, and Lt. Dorsey did not perceive Peterson to be a threat.

Lt. Dorsey's common practice is to search the trunk of a car when conducting an inventory search because he frequently finds valuables or contraband.  The LPD vehicle inventory search policy is silent on whether an officer should search the trunk of a vehicle.  During Lt. Dorsey's examination of the right rear fender well of the trunk of Peterson's car, he found a loaded Lorcin .380 caliber pistol, tire, and compact disks.  On locating the weapon, Lt. Dorsey signaled to Officer Sparks that he had found a weapon and that Peterson needed to be placed in custody.  Officer Sparks handcuffed Peterson, patted him down for officer safety, and detained him in the back of his squad car.  Peterson was being detained but was not under arrest.

After Lt. Dorsey secured the weapon, he checked to see whether it was stolen and learned that it was not.  He completed a standard

---

[4]Officer Sparks confirmed that the policy in question was the one he began using in February 2007.

LPD impoundment form, listing a tire and compact disks—but not the weapon—as the property found during the inventory search.  Lt. Dorsey did not list the firearm because it would not be staying with the vehicle; he took possession of it and logged it into the LPD gun box.  Lt. Dorsey's standard procedure is to remove firearms from vehicles that are being towed.  He did not note on the form whether any property was seized from Peterson's vehicle, and he did not issue Peterson a receipt for the firearm.  His standard procedure is not to list on the inventory contraband or items that he has taken into custody (although he does list them in the offense incident report).  He includes on the form items of value that are to remain with the vehicle.[5]

Lt. Dorsey talked with Peterson inside Officer Sparks's vehicle while Officer Sparks waited outside.  Their conversation lasted no more than 1 to 1½ minutes.  Lt. Dorsey did not give Peterson *Miranda* warnings first because he was not under arrest. He asked Peterson why he had the weapon in his trunk and whether he was "on paper," i.e., on probation or parole.  Peterson responded that he had the weapon because his girlfriend's apartment had been broken into several times and he was carrying the firearm for her protection.  Peterson said he was not on paper.

With the assistance of the LPD dispatcher, Lt. Dorsey ran

---

[5]Officer Sparks testified that although he does list on an impoundment form items that he is seizing, Lt. Dorsey's practice of not listing such items does not violate the LPD policy.

Peterson's name and date of birth for active warrants and was notified there were none. Because Lt. Dorsey could not confirm that Peterson had any felony convictions—he was only under the impression that Peterson had prior arrests—he did not arrest him. Had he known he was a felon, he would have arrested him. Lt. Dorsey was not aware that night that Peterson was suspected of having committed a sexual assault. Lt. Dorsey continued with the process of impounding Peterson's vehicle, and Officer Sparks drove Peterson home. Peterson was not arrested that night, but he was later arrested and ultimately indicted on the instant offense.

Peterson moves to suppress the firearm that Lt. Dorsey found in the trunk of Peterson's vehicle, contending that Lt. Dorsey did not act in accordance with the law and LPD's vehicle inventory policy when he searched the vehicle.[6] Peterson moves to suppress the statements he made to Lt. Dorsey while he was being questioned in Officer Sparks's squad car.

---

[6] In his motion and supplemental motion, Peterson also argues that it was unnecessary for Lt. Dorsey to impound Peterson's car because Peterson did not tell Lt. Dorsey that he could not pay to have the vehicle towed to his home. The government responded that, after the tow truck arrived, Peterson informed Lt. Dorsey that he could not afford to pay for the tow. At the suppression hearing, Peterson did not pursue this ground of his motion and supplemental motion or introduce evidence that he indicated to Lt. Dorsey that he was able to pay for the tow or that the tow was otherwise improper or unnecessary. This ground has therefore been abandoned and need not be addressed.

II

The court considers first whether the seizure of the firearm must be suppressed.

A

The government bears the burden of proving at a suppression hearing by a preponderance of the evidence that the Fourth Amendment has not been violated. *United States v. Matlock*, 415 U.S. 164, 177-78 n.14 (1974). "[I]nventory searches are now a well-defined exception to the warrant requirement of the Fourth Amendment." *Colorado v. Bertine*, 479 U.S. 367, 371 (1987). Once a vehicle is impounded, the police may inventory the vehicle's contents "to protect the owner's property while it remains in police custody, to protect the police against claims of lost or stolen property and to protect the police from potential danger." *United States v. Duarte*, 52 F.3d 1067, 1995 WL 241789, at *2 (5th Cir. 1995) (unpublished opinion) (citing *South Dakota v. Opperman*, 428 U.S. 364, 369 (1976)). Inventory searches "may be lawfully conducted while the vehicle is on the highway awaiting towing." *Id.* (citation omitted).

To defend against a Fourth Amendment challenge to an inventory search, the government must present evidence that the search was conducted pursuant to an established inventory procedure that "prevent[s] the police from conducting inventory searches as a ruse for general rummaging to discover incriminating evidence." *Id.*

(internal quotation marks and citation omitted). An inventory search policy need not be in the form of a specific, written policy. *See id.* In *Duarte* the court held that a search was not invalid even in the absence of specific, written guidelines because it was clear from officer testimony that procedures existed and that officers had received instruction regarding the procedures. *See id.* The court held that if the officer complied with the procedures, the search was reasonable. *Id.*

Provided the reason for the search is safekeeping of personal property and not simply searching for evidence, the Fourth Amendment is not violated. *See United States v. Como*, 53 F.3d 87, 92 (5th Cir. 1995). "When the police acquire temporary custody of a vehicle, a warrantless search of the vehicle does not offend Fourth Amendment principles so long as the search is made pursuant to standard police procedures and for the purpose of protecting the car and its contents." *Id.* at 91-92 (internal quotation marks and citation omitted). The police officer should follow the established procedures because this "tend[s] to ensure that the intrusion would be limited in scope to the extent necessary to carry out the caretaking function." *Opperman*, 428 U.S. at 375.

A policy that allows police officers some discretion in conducting inventory searches is not necessarily unconstitutional. "The exercise of police discretion does not violate the Fourth Amendment 'so long as that discretion is exercised according to

standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *Como*, 53 F.3d at 92 (quoting *Bertine*, 479 U.S. at 375). And "[a]llowing an officer to exercise his judgment based on concerns related to the objectives of an inventory search does not violate the Fourth Amendment." *Id.* (citing *Florida v. Wells*, 495 U.S. 1, 4 (1990)).

B

Peterson contends that the LPD does not have an inventory search policy, and, if it does, Lt. Dorsey did not act in accordance with the policy.[7] Because the court concludes from the evidence presented at the hearing that the LPD unquestionably has a standardized inventory search policy, it rejects Peterson's first argument and turns to his second argument.

Peterson maintains that Lt. Dorsey did not follow the LPD policy because he did not document the firearm on the inventory form.[8] The government responds that Lt. Dorsey complied with the

---

[7]In his supplemental motion, Peterson also argues that LPD does not provide guidelines for searching closed containers in vehicles. Because Peterson did not pursue this ground of his supplemental motion or introduce evidence in support of this ground at the hearing, this ground has been abandoned and need not be addressed.

[8]In his motion and supplemental motion, Peterson also contends that Lt. Dorsey did not comply with the LPD policy because he did not conduct the inventory along with the wrecker driver and because the LPD policy did not authorize Lt. Dorsey to detain a motorist while an inventory search is conducted. Because Peterson did not pursue this ground of his motion and supplemental motion or introduce evidence in support of this ground at the hearing, this ground has been abandoned and need not be addressed.

LPD Policy, and that he did not include the firearm because it was not left in Peterson's car when it was towed and impounded.

Before Peterson's vehicle was towed, Lt. Dorsey completed an impoundment form. In the section captioned "PROPERTY INVENTORY OF VEHICLE," Lt. Dorsey listed "Tire in trunk" and "CD's Passenger floor Board." Gov't Exh. 3. Lt. Dorsey did not check the "YES" or "NO" box on the line of the preprinted form for "Property seized." *Id.* The LPD policy requires that an officer "[c]omplete a personal property inventory along with the wrecker driver and document all personal property of value on the impound sheet." Gov't Exh. 1 at 4 (§ VI(B)(4)). The policy does not address whether an officer must document personal property *removed from the vehicle* prior to impoundment. It states, in pertinent part, that the personal property inventory must "document all personal property of value," *id.*, but this can reasonably be read to mean property of value that is to remain in an impounded vehicle. And the form provides a place for the wrecker driver's signature. Indeed, requiring the participation of the wrecker driver in preparing and signing the impound sheet would suggest that contraband such as drugs, firearms, and the like need not be listed, since it is doubtful that LPD officers would collaborate with wrecker drivers in inventorying such items.

Peterson introduced evidence at the suppression hearing that it is the personal practice of Officer Sparks and Detective James

Groom to list on the inventory section of the impoundment form all property being removed from a vehicle. But the government countered this proof with credible evidence that Officer Sparks and Detective Groom did not consider Lt. Dorsey's standard procedure to violate the LPD policy. There was no evidence, including the policy terms themselves, that establishes that Lt. Dorsey failed to act according to the policy.

The Fourth Amendment is not violated so long as the officer acts pursuant to an inventory policy that "sufficiently limit[s] the discretion of law enforcement officers to prevent inventory searches from becoming evidentiary searches." *Como*, 53 F.3d at 92 (internal quotation marks and citation omitted).

> [T]here is no reason to insist that [inventory searches] be conducted in a totally mechanical 'all or nothing' fashion. Inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger.

*Wells*, 495 U.S. at 4 (internal quotation marks and citation omitted). Moreover, an inventory policy that instructs officers to conduct an inventory of an arrestee's vehicle and complete an inventory form and that informs officers that the purpose of the inventory is to protect the city from claims of lost or stolen property is a constitutional policy. *See United States v. Andrews*, 22 F.3d 1328, 1336 (5th Cir. 1994).

The constitutional danger inherent in inventory searches is

that they may be used to search for evidence or for general rummaging that is otherwise unconstitutional.  But this concern is not present when, as here, the inventory search is conducted according to standard city policy, the officer acts according to his own standard procedure on a matter of form that the policy does not address, and the officer's own procedure does not enable him to engage in a search for evidence or in general rummaging under the guise of conducting an inventory search.  Lt. Dorsey's failure to note the seizure of the firearm on the impoundment form did not transform a constitutionally permissible inventory search into a Fourth Amendment violation.  Because the LPD policy "sufficiently regulate[s] the discretion of its officers to prevent them from turning inventory searches into 'a purposeful and general means of discovering evidence of crime,'" *Andrews*, 22 F.3d at 1336 (quoting *Wells*, 495 U.S. at 4), and because Lt. Dorsey's failure to list the seized weapon on the impound sheet did not violate the policy, the court holds that the government has established by a preponderance of the evidence that LPD has a standardized inventory policy and that Lt. Dorsey followed this policy.  The court denies Peterson's motion to suppress the seizure of the firearm.

III

The court considers next whether the statements Peterson made to Lt. Dorsey must be suppressed.

A

Peterson moves to suppress any statements he made to Lt. Dorsey while in the back of Officer Sparks's squad car on the ground that he was not given *Miranda* warnings. After Lt. Dorsey found the firearm, Officer Sparks handcuffed Peterson, patted him down for officer safety, and detained him in the back of his squad car. Lt. Dorsey asked Peterson about the firearm, and Peterson responded that he had the weapon because his girlfriend's apartment had been broken into several times and he was carrying the firearm for her protection. Peterson contends that Lt. Dorsey conducted the questioning as part of a custodial interrogation, thus requiring that Lt. Dorsey give him *Miranda* warnings first. The government responds that Peterson was not under arrest or its functional equivalent at the time.

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of

his freedom of action in any significant way." *Id.* "Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).

B

The government maintains that Peterson was not in custody when Lt. Dorsey questioned him. It posits that Peterson was only temporarily detained and handcuffed for officer safety; that the encounter occurred on a public road; that only two officers were present during Lt. Dorsey's questioning; and that there was no surprise because Lt. Dorsey and Peterson had been talking and looking for the tire before Lt. Dorsey questioned him.[9]

Peterson maintains that a reasonable person would not have felt free to leave when handcuffed and detained in the back of an officer's vehicle. The LPD report states "Peterson was placed into protective custody for officer safety and searched for other contraband." D. Exh. 4. Peterson also asserts that, at an examining trial held in state court, Lt. Dorsey initially admitted

---

[9]In *United States v. Bengivenga*, 845 F.2d 593 (5th Cir. 1988) (en banc), the Fifth Circuit considered relevant the length of detention and interrogation, the location of the detention, the number of officers present, and the element of surprise. *See United States v. Iqbal,* 2009 WL 361416, at *4 (S.D. Tex. Feb. 11, 2009) (citing *Bengivenga*, 845 F.2d at 598-600).

in his testimony that Peterson had been arrested and then changed his testimony to say that he was detained or in protective custody. At the suppression hearing, Lt. Dorsey testified that Officer Sparks placed Peterson in protective custody for officer safety, and that he was being detained but was not under arrest. Lt. Dorsey also testified that a reasonable person who observed Peterson in the back of the squad car would have thought he was in custody.

C

"A suspect is in custody for [purposes of *Miranda*] either (1) when he is formally arrested or (2) when a reasonable person in the position of the suspect would understand the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest." *Murray v. Earle*, 405 F.3d 278, 286 (5th Cir. 2005) (internal quotation marks and citation omitted). The court should not consider the defendant's history with law enforcement when determining whether a reasonable person would feel free to leave. *See Yarborough v. Alvarado*, 541 U.S. 652, 668-69 (2004) (noting that reliance on defendant's criminal history "turns too much on the suspect's subjective state of mind and not enough on the objective circumstances" (internal quotation marks and citation omitted)).

In *United States v. McDonald*, 2010 WL 2079549 (N.D. Tex. May 24, 2010) (Boyle, J.), Judge Boyle found that the defendant was in

custody when he was handcuffed for officer safety, even though he had not yet been arrested. *Id.* at *3 (finding that defendant was in custody because his freedom was significantly restrained by handcuffs). In *United States v. Vega*, 2007 WL 102150 (W.D. Tex. Jan. 8, 2007), the court held that the defendant was subjected to custodial interrogation where he was handcuffed, told he was being detained, and questioned by police officers; he had been patted down but remained handcuffed; and an officer testified that the defendant was not free to leave. *Id.* at *3-4. The facts of *Vega* are similar to those here. Peterson was handcuffed, placed in the back of Officer Sparks's squad car, and told he was being detained; Officer Sparks patted Peterson down but did not remove the handcuffs after determining that Peterson had no weapons; and Lt. Dorsey testified that Peterson was placed in protective custody for officer safety.

Although "not every handcuffing of a suspect transforms an investigation into a custodial interrogation," *id.* at *3, the government has not established by a preponderance of the evidence that a reasonable person in Peterson's circumstances would have felt free to leave. Instead, such a person would understand the situation to constitute a restraint on his freedom of movement to the degree that the law associates with formal arrest.

The court therefore grants Peterson's motion to suppress the statements he made to Lt. Dorsey on October 31, 2009 while being

custody when he was handcuffed for officer safety, even though he had not yet been arrested. *Id.* at *3 (finding that defendant was in custody because his freedom was significantly restrained by handcuffs). In *United States v. Vega*, 2007 WL 102150 (W.D. Tex. Jan. 8, 2007), the court held that the defendant was subjected to custodial interrogation where he was handcuffed, told he was being detained, and questioned by police officers; he had been patted down but remained handcuffed; and an officer testified that the defendant was not free to leave. *Id.* at *3-4. The facts of *Vega* are similar to those here. Peterson was handcuffed, placed in the back of Officer Sparks's squad car, and told he was being detained; Officer Sparks patted Peterson down but did not remove the handcuffs after determining that Peterson had no weapons; and Lt. Dorsey testified that Peterson was placed in protective custody for officer safety.

Although "not every handcuffing of a suspect transforms an investigation into a custodial interrogation," *id.* at *3, the government has not established by a preponderance of the evidence that a reasonable person in Peterson's circumstances would have felt free to leave. Instead, such a person would understand the situation to constitute a restraint on his freedom of movement to the degree that the law associates with formal arrest.

The court therefore grants Peterson's motion to suppress the statements he made to Lt. Dorsey on October 31, 2009 while being

custody when he was handcuffed for officer safety, even though he had not yet been arrested. *Id.* at *3 (finding that defendant was in custody because his freedom was significantly restrained by handcuffs). In *United States v. Vega*, 2007 WL 102150 (W.D. Tex. Jan. 8, 2007), the court held that the defendant was subjected to custodial interrogation where he was handcuffed, told he was being detained, and questioned by police officers; he had been patted down but remained handcuffed; and an officer testified that the defendant was not free to leave. *Id.* at *3-4. The facts of *Vega* are similar to those here. Peterson was handcuffed, placed in the back of Officer Sparks's squad car, and told he was being detained; Officer Sparks patted Peterson down but did not remove the handcuffs after determining that Peterson had no weapons; and Lt. Dorsey testified that Peterson was placed in protective custody for officer safety.

Although "not every handcuffing of a suspect transforms an investigation into a custodial interrogation," *id.* at *3, the government has not established by a preponderance of the evidence that a reasonable person in Peterson's circumstances would have felt free to leave. Instead, such a person would understand the situation to constitute a restraint on his freedom of movement to the degree that the law associates with formal arrest.

The court therefore grants Peterson's motion to suppress the statements he made to Lt. Dorsey on October 31, 2009 while being

detained in the back of Officer Sparks's squad car.

* * *

For the reasons explained, Peterson's September 8, 2010 motion to suppress, as supplemented on October 6, 2010, is granted in part and denied in part.[10]

**SO ORDERED.**

April 19, 2011.

                _____
                SIDNEY A. FITZWATER
                CHIEF JUDGE

---

[10] As noted, *see supra* note 1, this decision does not apply to any statements that Peterson made to Detective Groom on November 9, 2009.